IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GEORGE S. KOUNOUPIS and** | : | **CIVIL ACTION** |
| **HAHALIS & KOUNOUPIS, P.C.** | : | |
| Plaintiff, | : | |
| | : | **No.** |
| v. | : | |
| | : | |
| **MALIK EVANGELATOS,** | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |

## COMPLAINT

### I.     PARTIES

1.     Plaintiff, George S. Kounoupis ("Kounoupis") is an adult individual residing at 876 Merrivale Road, Bethlehem, PA 18017 and is a citizen of the Commonwealth of Pennsylvania.

2.     Plaintiff, Hahalis & Kounoupis, P.C., ("H & K") is a Pennsylvania Professional Corporation with its principal place of business at 20 E. Broad Street, Bethlehem, PA 18018.

3.     Kounoupis is an attorney with H & K engaged in the practice of law.

4.     The Defendant Malik Evangelatos is an adult individual residing at 1039 Alabama Street, San Francisco, CA 94110 and is a citizen of the state of California.

### II.     JURISDICTION AND VENUE

5.     The Jurisdiction of this Court is based on 28 U.S.C.A. §1332 in that it involves citizens of one state (Pennsylvania) against a citizen of another state (California) and the amount in controversy is more than $75,000. In this diversity jurisdiction case, Defendant is not a citizen of the same state as Plaintiffs.

6.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C.A. §1391 (b)(2), because the substantial part of the events giving rise to the claim occurred in the

judicial district. As set forth further herein, Defendant engaged the professional services of H & K, which has its principal place of business in Bethlehem, Northampton County, Pennsylvania. Further, as set forth herein, Defendant's conduct has been targeted at harming the professional reputation of Plaintiffs, who practice law in Northampton County, and has threatened conduct that occur in Northampton County, such as the posting of billboards or the mailing of targeted flyers.

## III.     STATEMENT OF CLAIMS

### BACKGROUND OF PLAINTIFF'S PROFESSIONAL PRACTICE

7.     George S. Kounoupis is an attorney who was licensed in Pennsylvania in 1987 and in New Jersey in 1988.

8.     Kounoupis graduated from Lehigh University with a Bachelor's Degree in International Relations in 1984 and obtained his JD from Temple University School of Law in 1987.

9.     While at Temple Law School, Kounoupis, taking advantage of Temple's Athens Law program and courses at Athens Law School, became one of the first United States licensed lawyers to take and pass the Greek Bar in 1990. At such time Kounoupis became dually admitted also as a Greek lawyer in the Athens Bar in which he was an active member from 1990-1996.

10.    On or about 1996, Kounoupis formed Hahalis & Kounoupis, P.C. (with the late George A. Hahalis, Esq.) after Kounoupis first worked as an associate attorney with one of the largest and oldest Philadelphia law firms.

11.    From 1990 to present, Kounoupis has continuously developed and cultivated a national and international reputation and expertise in USA-Greece legal matters and USA-Greece comparative law, representing numerous Greek-American organizations, chambers of commerce,

professional organizations, trade groups, the Greek Orthodox Archdiocese, non-profit organizations, educational institutions and foundations, between the USA and Greece; and is named, recognized and/or ranked in numerous USA-Greece legal organizations and institutions and listings.

12. Among the achievements of Kounoupis in USA-Greek law is becoming the American Bar Association Liaison to Greece; and being the former Chair and Vice-Chair of the ABA's Lawyers Practicing Abroad Committee. In 2015, Kounoupis led an ABA Conference in Greece focusing on Greek legal reform under the auspices of the Greek Ministry of Justice and the President of Greece, which was attended by the President of the ABA and the former Chief Justice of the Delaware Supreme Court. In 2016, Kounoupis led an effort of law reform with Greek Judiciary and lawyers to implement a mediation program. Kounoupis is currently involved in an effort to reform Greek law with the American Chamber of Commerce in Greece and the Greek Ministry of Justice.

13. Approximately 50% of the Kounoupis's law practice involves representing Greek-American and American residents with regard to their legal matters in Greece. Because this practice is not localized and such individuals are part of the Greek-American diaspora throughout all North America, Plaintiff's clients almost exclusively find Plaintiffs' services through the internet and/or to a lesser extent through the referral by individuals and law firms who know of Plaintiffs' reputation.

14. Because Plaintiffs' practice by its nature is not localized and not dependent on local reputation, clients are not near Plaintiffs' office to learn of Plaintiff's localized reputation directly and as a result statements on the internet regarding Plaintiffs' have a much greater and potentially

devastating effect if they contain defamation and disparagement. Hundreds of Plaintiffs' USA-Greek law clients and referrals are solely through the internet and 90% of Plaintiff USA-Greek practice results from clients searching and finding Plaintiff on the internet.

15. Because of the above extreme susceptibility of Plaintiffs' practice to targeted and orchestrated mass online and other defamation (such as Defendant has orchestrated as seen below) Plaintiffs' damages are well in excess of $75,000 and Plaintiff has already received comments from potential clients who are questioning Plaintiff's reputation.

16. In 34 years of law practice Plaintiff has never been sanctioned by any Disciplinary Board or Bar Association or entity.

## THE BACKGROUND OF DEFENDANT'S CASE

17. In accordance with the Model Rules of Professional Conduct, to the extent possible Plaintiffs set forth below the nature of Defendant's case omitting non-essential facts and details.

18. Defendant retained Plaintiffs, who have an office situate in Bethlehem, Northampton County, Pennsylvania, on a USA-Greek legal matter on May of 2019 with a retainer of $3,000 to be billed at $375 an hour. Leading up to this, Plaintiff provided and sent Defendant a lot of information and advice about his legal matter beginning in April of 2019 answering many questions of Defendant, at his request.

19. Between May 2019 and August 2021, Plaintiff engaged in substantial legal research, on site investigations in Greece, letters, translations, legal advice and other USA-Greek legal work on Defendant's case. During this period, *inter alia*, a constant exchange of documents and emails, between Plaintiff and Defendant took place as set forth below.

20. This included, without limitation, the review and analysis of multiple USA-Greek

legal documents by Plaintiff; two on-site legal investigations involving travel in Greece to Greek Registrars 5 hours from Plaintiff's Athens office; investigations with Registrars in Athens; the review, translation and Apostille of multiple, Birth, Death, Marriage, Divorce Certificates (USA and Greek).

21. During the course of the professional relationship, including through August of 2021, Defendant thanked Plaintiffs in writing for all their work and attention to his case in Greece as well as for providing updates thereon.

22. Defendant's legal issue involved the research and identification of all Greek vital ancestor records (birth, death, marriage) in the original villages in Greece where the Defendant's ancestors were born (such records unknown to the Defendant); to identify and match all those with records which related to and matched relevant United States vital record documents; and involved burdensome and bureaucratic procedures regarding the complicating factor of "name changes" as per comparisons between United States and Greek official documents.

23. Plaintiffs' work for Defendant did not involve just pure legal work but significant travel to conduct archive and registry investigations. This was necessary because Defendant did not have all of the documents needed for the legal work to be completed on his case.

24. On March 22, 2019 Plaintiff provided Defendant with a detailed review and legal analysis of numerous documents Defendant provided. This included advising Defendant of the results of Plaintiffs' contacts and investigations with the Municipality of Kefalonia and Plaintiffs' research on the legal procedure required in Defendant's case.

25. The above analysis discussed the specific legal issues as a result of Defendant's prior name change, the prior name change of Defendant's mother and the need to have Birth

Certificates corrected.

26. Defendant's case required an investigation into all Greek registries and records for all of Defendant's family members as to all births, deaths, marriages, divorces and family vital record registries. Some of these documents needed to be matched up with United States records.

27. On April 3, 2019 Defendant advised Plaintiff that his mother's name was different than what was listed on her divorce certificate. Plaintiff and Defendant also discussed the issues related to the amendments to his birth certificate needed by his own name change and his parents' divorce. Greek law is particularly strict on name changes requiring multiple records and affidavits to address these issues.

28. On April 8, 2019, Defendant wrote to Plaintiffs and apologized for the multiple emails to which Plaintiffs responded in order to clarify issues for him; and advising Plaintiffs that Defendant learned that his parents were married in Athens in 1986 or 1987. He indicated that he was waiting for his birth certificate in the USA which had been amended.

29. On June 17, 2019, Defendant sent Plaintiff an e-mail in response to Plaintiff advising Defendant on the issues related to the need for an amended birth certificate and amendments on the name change issues. Defendant indicated the State of California needs 4 – 6 weeks to provide what was needed.

30. On July 1, 2019 Plaintiffs informed Defendant that Plaintiffs were investigating with the Competent Special Registry in Athens and investigating/researching also in the Island Municipality of Kefalonia (5 hours away).

31. During July and August of 2019, Plaintiffs and Defendant corresponded multiple times discussing issues related to the name change of Defendant's mother as well as Defendant's

own name change. During this time there were also discussions about the fact that Defendant's mother's marriage certificate had a name that differed from the name on Defendant's mother's divorce decree and Defendant's birth certificate.

32. During this time Plaintiffs Apostilled, translated and sent to Greece copies and/or records related to the multiple Death Certificates; Marriage License and Decree of Divorce and name changes.

33. On September 6, 2019, Plaintiffs updated Defendant again on the specifics of the Greek legal issues that impacted Defendant's case. Plaintiffs further advised of the name change complications and advised Defendant how to get the United States information Plaintiff specifically needed on his mother's name change. At or about such time Plaintiffs sought legal input from the Greek Ministry of the Interior on how to resolve these issues.

34. On September 10, 2019, Plaintiffs obtained and review a copy of the Divorce Decree of Defendant's parents, which Plaintiff had to translate and send to Greece. This identified Defendant's mother's name only as Evangelatos. Plaintiffs explained that Greek Divorce Decrees always contain the wife's maiden name, raising another potential issue that needed to be resolved.

35. Because Defendant could not obtain the required documents himself, in November of 2019, Plaintiffs filed a legal petition and formal request to the Municipality of Kefalonia for official recorded family records.

36. On January 3, 2020, Plaintiffs translated and had Apostilled, at cost of $300, Defendant's birth certificate and the marriage certificate, which was forwarded to Defendant on January 6, 2020.

37. Starting in April of 2020, work on Defendant's legal issues was impacted by the

Coronavirus and the complete lockdown of all offices, government centers, courts and registry offices both here in the United States and in Greece.

38. On December 15, 2020 Plaintiffs sent Defendant a letter/update stating that, as part of Plaintiffs' ongoing investigation, Plaintiffs found the Death Certificate of Defendant's father as part of the ongoing research on-site in the Special Registry of Athens. Plaintiffs indicated that this in person investigation took multiples visits and attempts. Plaintiffs also advised Defendant that after many attempts and another on-site investigation and trip to Argostoli, located 350 kilometers from Plaintiff's Athens office and requiring a two day trip, Plaintiffs were able to obtain a copy of the Evangelatos family record, including records for Defendant's father, "Dionisios."

39. During this time frame, Plaintiffs advised Defendant of a new serious complication, based on the way the Greek Registry system is operated, which technically only allows one to be registered in one "Family Registry." Defendant's father was found to be also registered in the Municipal of Aegaleo.

40. Under Greek law, the official Family Registry entry is presumptive for all legal matters and cannot be disputed unless changed. This required correction by new filings in both Municipalities.

41. During this time, Plaintiffs also advised Defendant that numerous smaller Municipalities and villages in Kefalonia, where the research and filings were needed, merged administratively and changed their filing and recording methodologies, so it was extremely difficult for Plaintiffs to get needed records.

42. On or about July – August 2021, Plaintiffs advised Defendant that, in addition to the Covid closures continuing to cause massive delays in Greece into 2021, there were also

significant legal changes in Greek law effecting the specific Greek legal matters of Defendant.

43. One of these changes was that many of the required documents for cases such as Defendant's now needed to be filed in the United States Consulates offices. Additionally, certain United States original vital records that had been previously certified, translated and Apostilled to be filed in Greece now also needed to be filed in the United States Consulates office, with supporting Greek vital records also now required to be produced at those offices. These substantial changes in the law directly affected the pace and speed at which Plaintiffs could proceed with Defendant's case and finalization of the case.

44. Additionally, as noted herein, the mandated lockdowns due to the Coronavirus precluded travel and access to government and legal offices in Greece from March 2020 to January 2022.

45. The work needed for Defendant's legal issue required in person investigations, searches, amendments and filings, in Greek registries, vital records, courts, recorder and government offices in Greece. Plaintiffs were completely unable to access these sources due to the mandatory lockdowns in Greece and the travel restrictions associated with the Coronavirus.

46. At all relevant times hereto Defendant was aware that Plaintiffs were also representing his mother in a different case and was aware that Plaintiffs had done significant work on that case.

47. Multiple times through the representation of Defendant, Defendant repeatedly thanked Plaintiffs for the legal work they were performing.

48. In June of 2021, Plaintiffs offered to transfer Defendant's file and documents to any new attorney in Greece, if he desired.

49. On October 21, 2021, Defendant suddenly demanded that all of his retainer, in the amount of $3,000, and all of his mother's retainer, in the amount of $2,500, be returned to him. If these amounts were not returned, Defendant stated that he would destroy Plaintiffs' reputation on the internet including by calling and continuing to call Plaintiff "a thief," "incompetent" and crooked.

50. Defendant described to Plaintiffs an orchestrated plan, targeted at destroying Plaintiffs' reputation. This plan included posting on the internet and on social media sites that Plaintiffs were thieves and incompetent, which Defendant indicated he would continue to do unless his money was refunded.

51. An email chain between Plaintiff and Defendant is attached hereto as **"Exhibit A."**

52. On November 25, 2021, Defendant emailed Plaintiffs a review he had posted online where he called Plaintiff a "thief" and "idiot." As noted therein, Defendant offered to remove this posting if his money was refunded.

53. On December 28, 2021, Defendant posted on Plaintiffs' Facebook page and accused Plaintiffs of "literally attempting to rob us of our money" and again stated these social media postings would continue until his demands were met.

54. Defendant sent another email to Plaintiffs on February 24, 2022, a copy of which is attached hereto as **"Exhibit B."**

55. As noted therein, Defendant described an orchestrated plan to harm Plaintiffs, including writing negative reviews in local newspapers, sending USPS bulk mailings in and around Bethlehem, Pennsylvania, and posting a billboard in Bethlehem. This billboard accused Plaintiffs

of stealing his money.

56. In his December 30, 2021 email (*see* "Exhibit A"), Defendant stated: "[a]t this rate, I don't [sic] you will be receiving any super-lawyer awards this year" demonstrating that Defendant's plan was to defame and damage the reputation of Plaintiffs.

57. Subsequent to the above actions by Defendant, Plaintiffs advised Defendant that they no longer represented him and offered to account in detail for all billings; explain all billings; and return the file or convey it to any new counsel.

58. Plaintiffs issued Defendant an itemized, detailed invoice of all their work and offered to waive any fees above the $3,000 retainer. Plaintiffs explained that they were fulfilling their ethical duty to account for the retainer and also indicated that they would transfer the file to any other lawyer. Neither the accounting nor the offer to transfer the file or update the client were conditioned on any action by Defendant with respect to his ongoing defamatory conduct.

59. Plaintiffs advised Defendant that he had a right to discuss and question the invoice but Defendant did not do so—continuing to demand the payment of all monies "or else."

60. Defendant never asked for any discussion on the specifics of the billing or to question charges on the itemized invoice. Rather, despite knowing extensive work had been done on both his and his mother's legal cases, Defendant continued to insist that all monies be returned or he would continue with his campaign to destroy the reputation of Plaintiffs.

61. On May 2, 2022, Defendant sent an email which is attached hereto as **"Exhibit C."**

62. As set forth therein, Defendant states that "…my online reviews still stand, and this is costing him a lot of money" demonstrating Defendant's knowledge that his actions were causing financial harm to Defendants.

## IV. CAUSES OF ACTION

### COUNT I
### DEFAMATION

63. The preceding paragraphs are incorporated herein by reference.

64. Under Pennsylvania law, defamation *per se* can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct. *See Cornell Companies, Inc. v. Borough of New Morgan,* 512 F.Supp. 2d 238, 271 (E.D. Pa. 2007).

65. Defendant's statements calling Plaintiffs "thieves" and "incompetent" and suggesting Plaintiffs "took" Defendant's money or "robbed" Defendant are defamatory *per se* under Pennsylvania law.

66. Defendant's statements are clearly understood to apply to Plaintiffs as he references Plaintiffs by name and posted these statements in public forums associated with Plaintiffs, such as their Facebook page and on Yelp.

67. Defendant's statements were published online by Defendant, and he has threatened additional publication by USPS mailings and the taking out of a billboard near Plaintiffs' office.

68. Defendant acted with malice and intent to harm in that he knew he was not entitled to a return of all of the funds at issue and further stated his intent was to destroy Plaintiffs' reputation in an orchestrated and organized manner unless his demands were met.

69. Defendant's conduct has caused, and is causing and is capable of causing, significant harm to Plaintiffs' reputation.

70. Plaintiff has suffered and continues to suffer significant and ongoing damages and pecuniary harm as a result of the conduct of Defendant.

WHERERFORE, it is respectfully requested that this Court enter judgment in favor of Plaintiffs and against Defendants and award Plaintiffs compensatory damages in excess of $75,000, punitive damages, litigation costs, interest and any other relief the Court deems just or appropriate.

## COUNT II
### INTENTIONAL AND WRONGFUL INTERFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS

71. The preceding paragraphs are incorporated by reference.

72. The statements above identified by Defendant are false.

73. Defendant purposefully intended and intends for the statements to cause financial loss and damage to Plaintiffs' business.

74. Defendant's conduct is clearly a concerted attempt to prevent other people from engaging the legal services of Plaintiffs.

75. The statements of Defendant, which are defamatory *per se*, are not subject to any conditional privilege.

76. Defendants statements have caused pecuniary loss and financial damage to Plaintiffs and will continue to cause such harm if not abated.

WHERERFORE, it is respectfully requested that this Court enter judgment in favor of Plaintiffs and against Defendants and award Plaintiffs compensatory damages in excess of $75,000, punitive damages, litigation costs, interest and any other relief the Court deems just or appropriate.

## COUNT III
### COMMERCIAL DISPARAGEMENT

77. The preceding paragraphs are incorporated herein by reference.

78. The statements above identified by Defendant are false.

79. Defendant purposefully intended and intends for the statements to cause financial loss and damage to Plaintiffs' business.

80. Defendant's conduct is clearly a concerted attempt to prevent other people from engaging the legal services of Plaintiffs, causing harm to the business.

81. Defendant knows that the defamation and disparaging statements are false and has acted intentionally and/or with reckless disregard, with the aim to harm Plaintiffs.

WHERERFORE, it is respectfully requested that this Court enter judgment in favor of Plaintiffs and against Defendants and award Plaintiffs compensatory damages in excess of $75,000, punitive damages, litigation costs, interest and any other relief the Court deems just or appropriate.

## COUNT IV
## PRELIMINARY AND PERMANENT INJUNCTION

82. The preceding paragraphs are incorporated herein by reference.

83. Plaintiffs have been, and continue to be, contacted by potential clients, community members and others who are doubting or questioning Plaintiffs' reputation and ethics based on Defendant's defamatory publications and actions. Defendant continues to defame Plaintiffs in Pennsylvania and also on the nationwide and worldwide internet, web and social media. In particular, calling attorney crooks, thieves and unethical, saying they "took" money, as well as calling them unethical—has devastating consequences to an attorney's reputation, particularly when an attorney's practice is dependent on reputation and integrity.

84. Pursuant to Fed. R. Civ. P. 65, Plaintiffs seek a preliminary and permanent

injunction enjoining and restraining Defendant from making defamatory *per se* statements that Plaintiffs are crooks, thieves, frauds, unethical and/or incompetent.

85. Without such injunctive relief Plaintiffs will suffer irreparable loss and ongoing harm as above stated.

86. Plaintiffs have a likelihood of success on the merits, as the statements at issue are defamatory *per se* and not subject to any conditional privilege.

87. There is no adequate remedy at law for Plaintiffs, and if the Defendant is permitted to continue publishing and disseminating widely that Plaintiffs are thieves, crooks and incompetents, there is a great likelihood of permanent and irreparable harm unless the Court enjoins Defendant from such conduct.

WHERERFORE, it is respectfully requested that this Court enter a preliminary and permanent injunction in favor of Plaintiffs and against Defendants and enjoin Defendant from publishing any statements calling Plaintiffs "thieves" and "incompetent" and suggesting Plaintiffs "took" Defendant's money or "robbed" Defendant in any forum.

## V. JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury.

GROSS MCGINLEY, LLP

Dated: May 5, 2022  BY: _(signature)_
ANNE K. MANLEY, ESQUIRE
Attorney I.D. No. 51857
Attorney for Plaintiffs
101 Larry Holmes Drive, Suite 202
Easton, PA 18042
(610) 820-5450 Phone
(610) 820-6006 Fax
amanley@grossmcginley.com